SPECKART v. SCHMIDT et al.

(Circuit Court of Appeals. Ninth Circuit. October 2, 1911.)

No. 1,908.

1. TRUSTS (§ 305*)—ACCOUNTING—RIGHTS OF CESTUI.

Where complainant on coming of age was entitled to receive her distributive share of her father's estate from her mother. it was no answer to complainant's suit for an accounting that she was dominated in bringing the suit by another person to such an extent that she was not free to exercise her own will and was incompetent to manage her property. since such condition, if true, was ground only for the appointment of a guardian.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 305.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

2. TRUSTS (§ 305*)—ACCOUNTING BY TRUSTEE—CESTUI'S RIGHT TO SUE.

Where complainant's mother held complainant's share in her father's estate under a provision in a will that complainant was not entitled to receive the sum until she became of age, but for more than five years after that event the mother had made no accounting, and had failed and refused to pay over or account for complainant's share, she was justified in filing a bill for an accounting.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 305.*]

3. EQUITY (§ 359*)—SUIT—DISMISSAL—EFFECT.

Where complainant in a suit for an accounting did not waive an answer under oath, and, a full verified answer having been filed, the case was dismissed, such dismissal created no equities in defendant's favor, and did not affect complainant's right to file a new bill.

[Ed. Note.—For other cases, see Equity, Dec. Dig. § 359.*]

4. WILLS (§ 525*)—CONSTRUCTION—"GO TO."

Testator bequeathed to his wife and to his son and daughter each an undivided one-third of all of his property, declaring that all revenues arising from the property bequeathed to the children should "go to" the wife until the children became of age or should reach majority, according to the laws of Montana, after which the children should have their portions absolutely, the wife being directed to take and receive all the revenues of the property of both the children and use the same for their support and education. Held, that the words "go to," as so used, were not to be construed as equivalent to "give," "devise," or "bequeath," and hence did not vest in the wife any right to the surplus of the income of the children's portion not expended for their support and education.

[Ed. Note.—For other cases, see Wills, Dec. Dig. § 525.*

For other definitions, see Words and Phrases, vol. 8, p. 7672.]

5. TRUSTS (§ 292*)—EXPRESS TRUSTS—RELATION OF PARTIES.

Testator, having bequeathed to his wife, son, and daughter each an undivided one-third of his property, directed that the wife should receive the income of the children's portion until they became of age, and employ so much thereof as was necessary to their support and education. She was also appointed executrix of the will with authority to sell any of the property as she might think for the best interests of herself and children with the advice and consent of S., whom testator desired to advise and assist her in all matters relating to the estate. S. had been testator's partner and confidential friend in his lifetime, and, after settlement of the estate, he induced her to loan a portion of the funds through him to a corporation of which he was vice president, with which he consolidated certain breweries and made large profits. Held, that the relation between the widow and the corporation and S. was that of borrower and lender, and hence neither the corporation nor S. was required to account for any portion of such profits as trustee.

[Ed. Note.—For other cases, see Trusts, Dec. Dig. § 292.*]

Appeal from the Circuit Court of the United States for the Western Division of the Western District of Washington.

Suit by Harriet F. Speckart against Leopold F. Schmidt and others for an accounting. From a decree directing dismissal on terms, plaintiff appeals. Reversed and remanded, with directions.

On February 15, 1893, Adolph Speckart died in Montana, leaving a will by which he devised and bequeathed to his wife, Henriette Speckart, and to his daughter, Hattie Francis Speckart, and to his son, Joseph Robert Speckart. each an undivided one-third of all his property. It was provided in the will that all the revenues arising from the property so devised and bequeathed should go to the widow until the children should reach the age of majority as provided by the laws of Montana, "after which my said children shall

─────────────────────

have their said proportions absolutely, and I desire that my said wife shall take and receive all the revenues of the property of both my children hereinbefore bequeathed to them and each of them, and that my said wife shall use and employ said revenues for the support and education of my said children before named." The widow was appointed the executrix of the will with authority to sell and dispose of any or all of the property at such price and upon such terms as she might think for the best interests of herself and the children "with the advice and consent of Leopold Schmidt, who I desire shall advise and assist my wife in all matters pertaining to my estate." The will gave to the executrix also power to lease, convey, or agree to convey any or all of the property, and to have absolute and complete control and disposition thereof, "with the advice and consent of said Leopold Schmidt, and shall convert the same into money and the proceeds thereof shall be given as hereinbefore set forth to my said wife and children in equal proportions except that the revenues of said money or property belonging to my children shall be used by my said wife for the support and education of my children prior to their majority." The will was admitted to probate in the district court of the Second judicial district of Montana, for Silver Bow county, and the property was appraised at $55,800. The executrix thereafter disposed of the estate, realizing therefrom about $110,000. In May, 1896, she went to Germany, taking her two children. There she remained with them until November 1, 1901, when she and they returned to the United States. She bought a home in San Diego, Cal., where she and her children lived until about May, 1906. Harriet F. Speckart, the appellant herein, came of age on February 22, 1901. On September 28, 1907, she filed a bill in the Circuit Court of the United States for the Western District of Washington, Western Division, against the same parties who are the appellees herein, demanding an accounting, and the payment and delivery to her of her one-third share in the property of the Speckart estate, not waiving a verification to the answer. To that bill Henriette Speckart presented her verified answer, wherein was set forth her statement of the account between her and the appellee.

Thereupon that suit was dismissed, and on February 4, 1908, the appellant filed a second bill, which was the beginning of the present suit, in which an answer under oath was waived, and, in substance, the following averments were presented: After setting forth the death of Adolph Speckart, the terms of his will, the probate thereof, and the disposition of the property, it was alleged that for many years prior to the death of said Adolph Speckart Leopold Schmidt, his associate in business and his brother-in-law, was upon the most intimate business and friendly relations with him, and that while on his deathbed said Speckart requested Schmidt to assist and advise Mrs. Speckart in the management and settlement of the estate, and that Schmidt promised that he would carry out said wishes and requests, and that he voluntarily accepted said trust; that thereby, as well as by virtue of the will, the control and management of the estate was vested in Schmidt and Henriette Speckart, with all the duties and disqualifications incident thereto: that in 1895 and 1896 the executrix filed accounts of her trust, but thereafter filed no accounts; that from July, 1896, until the latter part of the year 1901, she and the appellant resided in Germany; that while in Germany she disposed of the last item of the property of the estate, namely, Centennial Brewing Company stock, for $100,000; that the money so received by her from the estate she used and invested on her own account; that all the investments still stand in her name, and none of them show or indicate that they are the investments of a trust fund or held in any fiduciary character. The bill specifies the stocks and property and notes so held, and proceeds to allege that Schmidt induced Mrs. Speckart to enter into an arrangement whereby the former was to use the funds of the estate in his business of managing brewing companies, and obtaining control over such companies, and thereby, in the use of said funds in such investments, he has gained large profits, the amount of which is unknown to the appellant, and one-third of which she is entitled to receive upon an accounting. The appellant further averred that it was not until May, 1906, more than five years after she reached majority,

that she was informed that her father had left a will with some provisions in her behalf, that she then sought information from' her mother, and requested an accounting, which was refused. Mrs. Speckart in her answer denied these last-mentioned· allegations, and alleged that the appellant knew of her rights under the will prior to the date mentioned, but she admitted that the appellant had requested of her an accounting of the property of the estate belonging to her, and the payment of her share to her. Mrs. Speckart did not allege that she had ever offered to account or had presented a statement of account of the estate, but she denied that she had refused to make such accounting or to deliver to the appellant her share in the property. Mrs. Speckart in her answer admitted that she had certain property, shares of stock, and money in her possession belonging to the appellant. Upon that admission, the appellant's counsel on July 20, 1909, obtained an order of the court requiring that Mrs. Speckart deposit in the registry of the court all moneys and other property capable of delivery, which she admitted to belong to the appellant. She thereupon surrendered to the clerk of the court certain shares of stock, and paid into the registry of the court $67,535.74, but in the memorandum of deposit she denied that the appellant was entitled to receive the whole of said money, or more thereof than $46,574.94 as of February 22, 1901, together with such sums as had been actually earned by investment, thereafter to be discovered and ascertained, and she claimed the right ·upon the final decree to have returned to her from the deposit so made such sum as should be found to be in excess of the amount payable to the appellant. On September 13, 1909, on the stipulation of the solicitors for the respective parties that the appellant was entitled to receive $50,000 of said fund, that sum was paid to her, and thereafter the further sum of $6,000 was paid to her upon a similar stipulation.

Upon the issues and the testimony, the court below made no specific findings of fact, but in an opinion on the merits held that the harsh accusations of the bill were not only not sustained by the evidence, but that the contrary was established affirmatively, and observed: "From the evidence it appears that the complainant is not heartless, nor avaricious, and that her unnatural conduct in prosecuting this suit is actuated by the baneful influence of a meddlesome person who dominates her by the exertion of a mysterious psychological power. The complainant is not the real litigant in this case, but is a mere tool of one who has no rights as against any of the defendants, and for that reason the court finds that there is no equity in the bill. Part of the funds belonging to the estate have been deposited in the registry of the court, and it will be necessary to retain jurisdiction of the case until proper disposition thereof can be made. After subsidiary questions shall have been disposed of, a final decree will be entered dismissing the suit, at the complainant's costs."

J. W. Robinson, for appellant.
Martin L. Pipes and G. C. Israel, for appellees.

Before GILBERT and MORROW, Circuit Judges, and WOLVERTON, District Judge.

GILBERT, Circuit Judge (after stating the facts as above). [1] The ground upon which it was held that there was no equity in the bill, which was that the appellant was under the influence of and was dominated by another, cannot be sustained. If, in fact, the appellant was dominated by another person to such an extent that she was not free to exercise her will, and was rendered incompetent to look after her property, and her property was in danger of being wasted, the case was one for the appointment of a guardian of her estate, and the duty was imposed upon her relatives to see that that was done. The person whose baneful influence is so adverted to in the opinion of the court is a female physician, whom the appellant met at a private hotel

in Portland in the fall of 1905. An ardent friendship grew up between them. A month later the appellant went to San Diego, and while there, during the next four months, she almost daily received letters from the physician and answered them. The appellant was eager to return to Portland to be again with her friend. In letters which she wrote to others about that time she made frequent references to her friend, and of their mutual devotion. After the appellant returned to Portland in 1906, her mother found in her room a package of 106 letters written to her by her friend within a period of 125 days. What the contents of the letters were is not disclosed, but they caused the mother great distress. Almost immediately thereafter the appellant left her mother, and has since, and up to the time of taking the testimony in the case, been with her friend. The evidence indicates that, whereas the relation between the mother and daughter up to that time had been of the most friendly and affectionate nature, the daughter became estranged from her mother and her brother, and changed in her demeanor toward all her relatives. But the facts as they are disclosed in the record are not sufficient to justify a court of equity in denying the appellant an accounting and a decree for the possession of her property, and upon this appeal it is not seriously contended that they are.

[2] Nor do we find merit in the contention that the appellant was not justified in bringing the suit. The issue that a suit was not necessary was not raised in the pleadings, nor was it alleged in Mrs. Speckart's answer that she had ever made a statement of account, or had offered to turn over to the appellant any particular property as her share of the estate. In her answer to the first bill Mrs. Speckart made for the first time a statement of the account as she claimed it to be.

[3] The fact that the first suit was dismissed, however, creates no equities in her favor. The appellant was not bound to accept that statement of the account. She was entitled to the judgment of the court upon the issues in the case, and the evidence to be adduced thereunder. Mrs. Speckart's attitude to the accounting is forcibly exhibited in the memorandum of deposit which she made at the time when she paid $67,535.74 into the registry of the court, in which she plainly stated her own want of knowledge as to the amount due the appellant on the accounting, and submitted the question to the decision of the court. Instead of accounting or offering to account upon the first demand of the appellant in the spring of 1906, Mrs. Speckart went to Olympia, Wash., and almost immediately after her arrival there, on May 16, 1906, she assented to an application which was filed in the superior court at Olympia for the appointment of an administrator with the will annexed of the Speckart estate. In June, 1906, Schmidt was appointed such administrator. He sought and obtained an order of the superior court that the estate was community property, and that the testator could dispose of but one-half thereof by will. That position was subsequently abandoned by his counsel on discovering that no community property law was in force in Montana at the time of the testator's death, but the order was not set aside, and it still remained in force until December 20, 1907, when, on a writ of

review from the Supreme Court of Washington, on the relation of Harriet Speckart, the order appointing the administrator and admitting the will to probate were set aside, the court holding that there was no justification for administration with the will annexed 13 years after the death of a testator who died in Montana where the widow was appointed administratrix, and where notice to creditors had been duly given, and where her accounts had been approved, and nothing remained to be done except to distribute the estate according to the law of that state, vesting the same in the devisees. Said the court:

"If the final account of the administrator should be approved as rendered, the cost of administration will approximate $20,000. By reason of its pendency the relator is deprived of the use and enjoyment of her portion of the estate for an indefinite period, and is compelled to contribute $6,000 or $7,000 towards the expenses of what is at best an idle ceremony. Against such a proceeding under the forms of law, we think she has ample grounds to complain." State ex rel. Speckart v. Superior Court, 48 Wash. 141, 92 Pac. 942.

Before the date of that decision, and on March 29, 1907, the appellant's counsel wrote to the attorney for Mrs. Speckart, saying:

"For almost one year we have been endeavoring without litigation to procure for Miss Speckart her interest in what your people have been pleased to term her father's estate. * * * If you desire to confer with us here either Monday or Tuesday of next week, please notify me upon the receipt of this letter. Otherwise I am authorized to state that action will be instituted without any further delay by her to obtain what we believe to be her interest in the estate, which has been used by Mr. Schmidt for more than 14 years."

Nothing seems to have been done in response to this demand. Six months later the appellant filed her bill in equity for an accounting. The weight of the evidence indicates that up to the spring of 1906 she was never informed of her rights under her father's will, but that she supposed that all the property had been left to her mother during her lifetime, and that, upon her mother's death, the children would come into a share of the estate. There is evidence of disinterested witnesses that the mother made in the appellant's presence statements to that effect. On the other hand, there is evidence of other disinterested witnesses that on at least two occasions Mrs. Speckart made statements in the presence of the appellant indicating that the latter on coming of age would come into a large property. Those statements, however, in view of the language used, may in the main be harmonized with the appellant's understanding that she was not to come into her property until her mother's death, and that her mother had a life estate in all the property left by her father. It is probable that information as to the appellant's property rights was withheld from her by the mother, for in her own testimony it appears that she feared that, if it were known that her daughter at 18 years of age would come into a large estate, she might become the object of the pursuit of fortune hunters. The evidence clearly indicates, also, that after the appellant had demanded an accounting her mother was reluctant to give it, and reluctant to relinquish the daughter's share in the estate. Actuated by motives which can easily be understood, and, indeed, commended, the appellant's mother and uncle evidently felt justified from

their viewpoint in interposing obstacles to the payment to her of her share of the estate so long as she was under the influence of that strange friendship which they deplored, the influence of which, they feared, might result in the dissipation of the property which they had so carefully and prudently managed and invested.

[4] The appellees present in this court for the first time a contention which, if sustainable, would call for a readjustment of the statement of the account which they claim to have made, and an accounting upon a basis different from that which they assume in their answers. The contention relates to the fifth clause of the will, which provides that all the revenues arising from the property devised and bequeathed to the children "I direct shall go to my wife Henriette Speckart until my said children shall become of age, or shall reach the age of majority by the laws of Montana, after which my said children shall have their said proportions absolutely, and I direct that my said wife shall take and receive all the revenues of the property of both my children hereinbefore bequeathed to them, and to each of them, and that my said wife shall use and employ such revenues for the support and education of my said children before named." It is urged that thereby Mrs. Speckart was made the absolute owner of all the revenues of the children's property until their majority, subject only to the requirement that out of same the expense of the support and education of the children should be paid, and that the overplus after the payment of such expenses belongs to her. Counsel for the appellees cite cases which hold that where the income of children's legacies is given to a parent to be applied for or towards their maintenance and education, in the absence of a provision indicating a contrary intention, the parent shall not be held to account for the surplus. Gilbert v. Bennett, 10 Sim. 371; Hadow v. Hadow, 9 Sim. 348; Leach v. Leach, 13 Sim. 304. In the first of the cases cited there were words in the will which expressly relieved the parent from the obligations to account. In Hadow v. Hadow, the funds were to be by the widow applied "for and towards the maintenance, education and advancement in life of my said sons, or the survivor of them, in such manner as she shall think proper." The vice chancellor said that the testator meant that his widow and children should live together, and that during her life she should have the income of the children's property to maintain them without being liable to account. But in other cases where there has been found in the will an expression of the testator's intent that the income for maintenance and education should be held in trust the English courts have given effect to that intention, as in Taylor v. Bacon, 8 Sim. 100; Weatherell v. Wilson, 1 Keen. 80; Wilson v. Madison, 2 Y. & C. C. C. 372; Re Harris, 7 Exch. 344. In the present case we find evidence of the intention of the testator that the surplus of the income after payment of the maintenance and education of the children was not to go to the widow in her own right. The will begins by giving to her one-third of all the testator's property "absolutely and unconditional." Therein was expressed the full measure of the testator's intention to give to the widow property in her own right absolutely. From the use of the words "absolutely"

and "unconditional" here and not elsewhere in the instrument it is reasonable to infer that the further provision of the will by which all the revenues of the children's property are "to go to"—that is to say, are to be paid to the widow, and are to be received by her and used in the payment of the expense of the maintenance and education of the children until their majority—means that the revenues were not to go to her absolutely, but upon condition, the condition that she use the whole of the same for the children's maintenance and support until their majority. It is to be observed that the will does not say that "out of" the revenues she shall pay for the support and education of the children. It is evident that in the mind of the testator it was contemplated that the whole of the revenues of their shares would be necessary for that purpose. There is nothing in the language of the will to indicate his intention that the widow was to be the beneficiary of any part of those revenues. If there was a surplus after the payment of those expenses it is the fair construction of the will that the widow received the same in trust for the children. The full extent of the testator's bounty to the widow was that she should receive one-third of the property and the income of the same. She so understood the meaning of the will, and acted on that understanding until the presentation of the case here on the appeal. Counsel for the appellees refer to the words "go to" as indicating an intention to vest in the widow the revenues subject to the obligation to pay the designated expense out of the same. Undoubtedly in many cases the words "go to" as used in a will are to be construed as equivalent to "give," "devise," or "bequeath," and cases are cited which so hold, but they are all cases in which effect was thereby given to the evident intention of the testator.

[5] One of the principal questions in the case is whether the appellant is entitled to receive from the appellees Schmidt and the Olympia Brewing Company one-third of the earnings of certain sums loaned by Mrs. Speckart to that company, a corporation of which Schmidt was the vice president, and used by the company in the purchase of stock in other breweries. On December 18, 1901, the brewing company through Schmidt had borrowed from the trust fund $3,000. On the following day it borrowed $5,000 and on February 19, 1902, $4,-523. On the date last named which was two days before the appellant came of age, Schmidt induced Mrs. Speckart to invest $20,000 of the trust fund in shares of stock of the Olympia Brewing Company. On April 9, 1902, Mrs. Speckart loaned to the Olympia Brewing Company $50,000 for which that company gave her its note and offered to give her security by mortgage on its property or by the personal indorsement of the members of its board of directors. With that sum Schmidt enlarged the breweries of the company, purchased other breweries, and established a brewery trust which made large profits. The question is, Shall he be required to account as a trustee for his share of those profits? The will appoints Henriette Speckart the executrix, gives her authority to sell and dispose of the property upon such terms as she may think for the best interests of herself and children, "with the advice and consent of Leopold Schmidt, whom I desire shall ad-

vise and assist my wife in all matters pertaining to my estate." Any words which indicate with sufficient certainty the intention to create a trust will have that effect notwithstanding that there may be no use of the word "trust" or "trustee," but it would be a forced construction to hold that the words of the testator in this case indicate an intention that Schmidt was to be a trustee. He was not by the terms of the will entrusted with any property, nor was he vested with the possession, management, or control of any of the property of the estate. He stood in a relation of trust and confidence toward the executrix, and that is all. It was sufficient to cast upon him the burden of proving his utmost good faith in all his dealings with her. He was not prohibited from borrowing the money of the estate from her, but, having done so, it devolved upon him to prove that the transaction was fair and honest, and was fully understood by the executrix, and was not to the detriment of the estate. The executrix in loaning the money had the legal custody thereof, and had the sole right to invest it. The mere fact that she had·trust and confidence in Schmidt, and was directed by the will to consult and advise with him, did not prevent her from loaning money to him, or to a corporation in which he was a stockholder. Such a transaction is not void, but is voidable only in case of an abuse of the confidential relation. "In brief, where parties occupy a relation from which an unusual degree of confidence or affection arises, the party in whom such confidence is reposed is held to the utmost good faith. Thus a confidential adviser, though not an attorney or solicitor, may be subject to the same rule." 9 Cyc. 459. The evidence sufficiently shows the good faith of Schmidt in the transaction. The money had been placed at interest by the executrix in Germany, where it was earning 4 per cent. Schmidt induced her to bring it to the United States upon the representation that here it could be securely invested at a higher rate of interest. For the money which he and the brewing company borrowed 6 per cent. has been paid. There has been no loss, nor does it appear that there has been danger of loss of any of the money.

The decree is reversed, and the cause is remanded to the court below to find the account, and render a final decree not inconsistent with the views herein expressed.